**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
─────────────────────────────────────────

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        **v.**              **06-CR-192A(Sr)**

**HOI YAN HO a/k/a "Renee,"**

        **Defendant.**

─────────────────────────────────────────

## REPORT, RECOMMENDATION AND ORDER

This case was referred to the undersigned by the Hon. John T. Elfvin, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.  The case has now been reassigned to Chief Judge Richard J. Arcara.

## PRELIMINARY STATEMENT

The defendant, Hoi Yan Ho  ("the defendant"), is charged with having violated 18 U.S.C. § 1956(h) (Count 1) and 18 U.S.C. § 982(a)(1) (Count 2). (Docket #13).  The defendant has filed a motion and supplemental motion seeking suppression of her statements as evidence at trial as well as suppression of certain items and currency seized from her vehicle.  (Docket #s 17, 26).  The government has filed its opposition to those motions.  (Docket #s 19, 27).  An evidentiary hearing on the aforesaid motions was held by this Court on October 1, 2007 and a transcript of that proceeding was filed on October 16, 2007.  (Docket #42).  Thereafter, post-hearing

memoranda of law were filed by the defendant (Docket #56) and the government

(Docket #57).


**FACTS**[1]

An investigation involving the defendant was being conducted by

Immigration and Customs Enforcement ("ICE"), and when she appeared for entry into

the United States at the Rainbow Bridge on September 25, 2005, Special Agent Randle

was notified by the inspectors at the bridge.  He traveled to the Rainbow Bridge and

observed the defendant at that location.  (T. 101-102, 84-85).  The defendant had been

detained at the bridge while the inspectors awaited his arrival, and during that time

period, the defendant's vehicle was inspected, which inspection was reported as being

"negative."  (T. 102).  He learned from the inspectors that the defendant had advised

them that she was going to the casino in Niagara Falls, New York.  (T. 85).


The defendant was cleared for entry into the United States, and she drove

her Toyota Corolla to the casino in Niagara Falls, New York while being followed by

Special Agent Randle.  (T. 85).  Upon arrival at the casino, Special Agent Randle

observed the defendant "park her vehicle in the parking ramp of the casino located on

Niagara Street" and proceed "inside the casino grounds."  (T. 86-87).  He contacted the

---

[1] The facts are taken from the transcript of testimony given at the evidentiary hearing conducted by this Court on October 1, 2007 and from the affidavit of Special Agent Randle in support of the Criminal Complaint initially filed against the defendant. (05-M-118, Docket #1).  References to the transcript are indicated by "T" with the appropriate page references following.

security department of the casino and requested assistance in the surveillance of the

defendant while she was in the casino by use of the casino's video surveillance system.

(T. 86, 101-102).

        "Casino surveillance did record [the defendant] meeting initially with two

individuals, inside the casino initially (sic)."  (T. 87).  Thereafter, she apparently was

tracked leaving the casino "with two individuals she initially met and walked into the

casino parking ramp."  (T. 87).  Special Agent Randle observed the defendant "inside of

her vehicle" and "shortly after that she proceeded inside the casino a second time."

(T. 87-88).  He "observed her walking to the casino through the [parking] ramp

entrance," "at which time, the [casino security] surveillance obtained a video

observation of her.  (T. 88).  After her second entry into the casino, the defendant met

"with four other individuals" who were different from the first two individuals she had

met.  (T. 88-89).  The defendant and these four individuals were observed conversing

with one another "for several minutes" and then they dispersed; two walking "in a

different direction while the other two individuals walked out of the casino towards an

exit located on the other side of the casino opposite the ramp" and "proceeded to the

parking lot which was on Duggan and 4th Street."  (T. 89).  They arrived at a Mazda

Tribute automobile bearing Ontario license plates ANRP081, in this lot which was

already occupied by the other two individuals who had departed in a different direction.

The defendant and the two individuals with her entered this same vehicle.  This vehicle

"left the parking lot shortly thereafter with all five occupants and proceeded around the

block and back into the casino parking ramp" and "proceeded to pull up next to the

defendant's vehicle and parked next to it.  The defendant got out of the vehicle and got

into her vehicle, and another one of the four individuals that was seated in the

passenger's side of the other vehicle got out of that vehicle and got into the passenger

seat of her vehicle."  This individual remained in the defendant's vehicle "about five

minutes" and then returned to the Mazda Tribute from which he had come.  (T. 89-90).

Thereupon, the defendant departed in her vehicle "and proceeded down the parking

ramp and parked into (sic) a different parking space in the parking ramp."  (T. 90).  The

Mazda Tribute remained parked where it was "for several minutes and then it departed

the parking ramp and exited the parking ramp and proceeded towards the Rainbow

Bridge."  (T. 90-91).


Special Agent Randle contacted the U.S. Customs and Border Protection

("CBP") Officers at the Rainbow Bridge and requested that they conduct an "outbound

inspection of the Mazda (ANRP081)" (05-M-118, Docket #1, ¶ 7).


In the meantime, Special Agent Randle kept the defendant's vehicle

under observation in the area where she parked it and it remained in this spot with the

defendant in it for approximately "15 minutes."  During this time, he "observed the

defendant inspecting her trunk and the interior compartment, visor area" and appeared

to be "just wait[ing] around, didn't seem to do much, and then she got into her vehicle

and left the parking ramp" and proceeded to the Rainbow Bridge while he continued to

keep her under his observation.  (T. 91-92).  He called ahead to the Bridge and "notified

the inspectors" to stop her upon her arrival at the Rainbow Bridge  (T. 92) because he

"had reason to believe that something criminal might be going on."  (T. 104).

Special Agent Peter Uzarowski, as a Customs and Border Protection Officer at the Rainbow Bridge, in response to a directive from his supervisor Peter Scoma, stopped the defendant's vehicle in the primary inspection area of the Rainbow Bridge and directed the defendant to pull over not as a "routine pullover" but pursuant to the directive that he had received from his supervisor and/or Special Agent Randle.  (T. 18).  Special Agent Uzarowski addressed the defendant in English and the defendant engaged in a conversation with him in English as did he with her.  (T. 11, 21, 30).  He asked the defendant "how much currency she was traveling with" and "explained the reporting requirements when you enter and exit the U.S." and he "gave her a form to fill out that states the reporting requirements."  (12, 24, 32).  He "asked [the defendant] if she understood, to which she responded yes, she did, and [the defendant] filled out the form."  (T. 12, 25, 28).  He "asked her to sign the form, date it and write down how much currency she was traveling with."  (T. 12).  The defendant "claimed she was traveling with $500 Canadian."  (T. 12).  The Currency Reporting Form contains the notation: $500 - Canada, 25 Sept. 2005" and what purports to be a signature.  (*See* Government Exhibit 1).[2]  This conversation with the defendant lasted "probably 30 seconds to a minute."  (T. 22-23).  He then directed the defendant to "pull her car out of the inspection lane" and drive it over to the "canopy area," which was a secondary inspection area, which the defendant did.  (T. 13-14, 23).

_____

[2] Exhibit references are to those exhibits received in evidence at the suppression hearing conducted by this Court on October 1, 2007.

Special Agent Uzarowski proceeded to the secondary inspection area under the "canopy" where he had directed the defendant to drive her vehicle.  In this area were Special Agent Randle, Supervisory Officer Kevin Corsaro and Supervisor Peter Scoma.  (T. 14-15).

At this secondary inspection area, Special Agent Randle "read her Miranda rights from The Advisement of Rights card" in English and she "acknowledged the Rights and/or warnings" and agreed to answer his questions.  (T. 96, 110-111, 113, 118-119).  Special Agent Randle questioned the defendant in English and "asked her if she could understand [him] and the defendant replied that she could (T. 93, 95, 125) and all of these agents heard his questions and the responses given by the defendant in English to his questions.  (T. 15-16, 37, 41, 51-52).  Supervisor Scoma admitted that the defendant spoke with an "Asian accent" and that her English was "broken" but he was nevertheless of the opinion that there was no need to seek the assistance of an interpreter in questioning the defendant because he "could clearly understand [her] answers."  (T. 38, 41-42).  Supervisory Officer Corsaro also testified that the defendant spoke in "broken English" and with an "accent."  (T. 58, 60).  Both officers heard Special Agent Randle ask the defendant "about her activities at the casino."  The defendant responded by stating that "she was gambling while she was there."  (T. 56-57).  In response to the question of whether she had met anyone at the casino, the defendant initially responded "no" but changed her answer after Special Agent Randle told her that he had observed her at the casino, to admitting that she had "met with two friends she knew from Toronto."

(T. 48-49).

While Special Agent Randle was questioning the defendant at the "canopy" area, a secondary inspection of the defendant's vehicle was conducted. (T. 34, 44-46, 49-50, 94).  "Secondary searches following initial customs inspections are, like the initial inspection, valid border searches which, if routine, do not require reasonable suspicion."  *United States v. Irving*, 452 F.3d 110, 124 (2d Cir. 2006); *United States v. Nieves*, 609 F.2d 642, 647 (2d Cir. 1979).

The conversation between Special Agent Randle and the defendant at the "canopy" area lasted approximately "15-20 minutes," (T. 44, 95).  The defendant was then taken to a "hold room," *i.e.,* a "detention room" in the Rainbow Bridge facility, and an additional "examination of [her] vehicle" was conducted by "the CP Officers."  (T. 95, 97).

The four individuals whom Special Agent Randle had observed in the casino parking lot had also been detained at the Rainbow Bridge, and those individuals were also interviewed by Special Agent Randle after the defendant had been taken to the "hold room."  (T. 97).

The four occupants of the Mazda (ANRP081) were identified as Hao Zhong, Ji Ying Liu, Di Hui Liew and Thean Yew Lim.  Each of these individuals filled out a Customs Declaration form indicating the amount of currency each was in possession

of.  Zhong declared $9,000 U.S. currency; Liew declared $9,000 U.S. currency; Lim

declared  $4,000 U.S. currency; and Liu declared $8,000 U.S. currency."  The U.S.

currency found in each of the [individual's] possession was packaged as bundles bound

by black rubber bands."  (05-M-118, Docket #1, ¶s 9 and 10).


          Special Agent Randle interviewed these four individuals at the Rainbow

Bridge facility and they admitted that the had "met with an Asian female, identified as

Ho."  Liew admitted that he met with the defendant in her vehicle parked in the casino

parking ramp and that the defendant had given him "bundles of U.S. currency" which he

subsequently distributed to Zhong, Liu and Lim.  All four were "to transport the bundles

of currency to Canada and take $200 U.S.D. each from the bundles as payment after

doing so."  Each individual "understood the $10,000 reporting requirements and

admitted to structuring the currency to avoid those reporting requirements."  (05-M-118,

Docket #1, ¶ 11).


          Sometime during the day of September 25, 2005, Special Agent Randle

called Special Agent Glor of ICE and requested his assistance at the Rainbow Bridge

facility.  Special Agent Glor arrived at the facility "around midnight" (T. 63, 67) and

Special Agent Randle "briefed [him] on the situation" and told him of his prior

conversations with the defendant earlier that day.  (T. 71, 82).  Thereupon, Special

Agent Randle, in the presence of Special Agent Glor conducted an interview of the

defendant in the "break room" of the Bridge facility.  However, before questioning the

defendant, Special Agent Glor heard Special Agent Randle "give Miranda warnings" to

the defendant by reading "them off the card that [he] had" and the defendant "acknowledged the warnings as he provided them to her" and indicated her willingness to waive her rights when asked by Special Agent Randle.  (T. 63, 65, 70, 73, 75-76, 97-98).  Special Agent Randle spoke to the defendant in English and she responded to his questions in "understandable" English but spoke with an accent.  (T. 64, 77, 78, 98).  Neither Special Agent Randle nor Special Agent Glor saw any need to call upon an interpreter in conducting the interview of the defendant.  (T. 82-83, 99, 128).  The defendant told them that "she goes by the English nickname "Renee" and that she had gone to the Seneca Niagara Casino to gamble.  She stated that "she did not meet anybody at the casino, she did not give anybody any money at the casino or at any time or in the parking lot."  (T. 64).  Special Agent Randle specifically asked the defendant whether she had "met with anyone inside the casino;" did [she] see anyone [she] recognized?"; did [she] receive a ride in any vehicle?"; and the defendant responded in the negative to each question.  Her answers were contrary to what Special Agent Randle had observed (T. 126) and from what he had learned in his interview of Zhong, Liew, Lim and Liu.  (T. 97; 05-M-118, Docket #1, ¶s 9-11).

After Special Agent Randle advised the defendant that he had "observed her doing something different than what she was telling [him]," the defendant admitted that "she did meet with someone."  (T. 127).

The secondary search of the defendant's vehicle resulted in the finding and seizure of "a plastic bag containing rubber bands, a box containing white plastic

garbage bags, a roll of clear plastic box tape, a calculator, two small plastic bags with sequentially ordered numerical markings printed upon them, and other items." (Defendant's Motion to Suppress Evidence, Docket #17, p. 24); (T. 115).

The defendant was placed under arrest and charged with having violated 18 U.S.C. § 1001 and her vehicle was seized and is presently subject to contested forfeiture proceedings.[3]   (Defendant's Second Motion to Suppress Evidence, Docket #26, p. 4).

Thereafter on or about September 13, 2006, a search of the defendant's vehicle was conducted and $25,000 in U.S. funds and $500 in Canadian funds was discovered in the "headliner" of the defendant's vehicle and seized by the government. (Docket #26, p. 3).

At the evidentiary hearing, the defendant called her aunt, Fanny Lai-Fan Leung, as a witness to support her claim of lack of understanding of the English language in her attempt to establish that she did not knowingly waive her right against self incrimination because she did not really understand the "Miranda" warnings and rights that were read to her by Special Agent Randle on September 25, 2005.

---

[3] *United States v. 2004 Toyota Corolla*, 06-CV-40.

Miss Leung testified that the defendant spoke "very little" English (T. 133) and that "she can only manage broken English, very simple words, very short broken language - - - sentences."  (T. 136).  It was Miss Leung's opinion that the defendant only "under[stood] very simple English, 10, 20 percent, maybe."  (T. 139).

On cross examination, Miss Leung admitted that the defendant has resided in Canada for twenty (20) years and that she had attended high school in Toronto where English was spoken.  (T. 145-146).  The defendant's first twelve years of education were in Hong Kong, China and English was taught in the Hong Kong schools.  (T. 145).

## DISCUSSION AND ANALYSIS

### A.    Defendant's Motion To Suppress Her Statements:

The defendant argues that "no reasonable suspicion or probable cause was shown to have existed prior to the time that [her] vehicle was stopped by the agents" and "thus, her subsequent detention and questioning took place while she was in custody."  As a result, "any subsequent statements she gave without the benefit of reasonable suspicion or probable cause to believe that she had committed a crime cannot be countenanced."  (Docket #56, pp. 14-15).

The defendant further argues that because of her limited understanding of the English language, she did not "knowingly and voluntarily waive[ ] important constitutional rights which she possessed" notwithstanding the government's claim that

she was adequately advised of her rights and that she waived them.  (Docket #56, pp.

17-18; Docket #57, p. 3).


As the United States Supreme Court has expressly stated in *United*

*States v. Montoya De Hernandez,* 473 U.S. 531, 537-538 (1985):

> . . . Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country. *See United States v. Ramsey*, 431 U.S. 606, 616-617, 52 L.Ed.2d 617, 97 S.Ct. 1972 (1977), citing Act of July 31, 1789, Ch. 5, 1 Stat. 29.

> Consistently, therefore, with Congress' power to protect the Nation by stopping and examining persons entering this country, the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior.  Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant, and first-class mail may be opened without a warrant on less than probable cause.  *Ramsey, supra.*  Automotive travelers may be stopped at fixed checkpoints near the border without individualized suspicion even if the stop is based largely on ethnicity, *United States v. Martinez-Fuerte*, 428 U.S. 543, 562-563, 49 L.Ed.2d 1116, 96 S.Ct. 3074 (1976), and boats on inland waters with ready access to the sea may be hailed and boarded with no suspicion whatever.  *United States v. Villamonte-Marquez, supra.*

> These cases reflect longstanding concern for the protection of the integrity of the border.  This concern is, if anything, heightened by the veritable national crises in law enforcement caused by smuggling of illicit narcotics, *see United States v. Merdenhold*, 446 U.S. 544, 561, 64 L.Ed.2d 497, 100 S.Ct. 1870 (1980) (Powell, J. concurring), . . . .

The rationale behind the validity for conducting border searches and its exception to Fourth Amendment requirements applies with equal force to persons or objects leaving this country as well as those entering.  *United States v. Ajlouny*, 629 F.2d 830, 833-835 (2d Cir. 1980); *United States v. Swarovski*, 592 F.2d 131, 133 (2d Cir. 1979); *California Bankers Association v. Shultz*, 416 U.S. 21, 63 (1974).

Because the decision of the Court of Appeals for the Second Circuit in *Tabba v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) resolves this issue raised by the defendant, brevity has been deliberately sacrificed in setting forth the relevant portions of the Court's decision at length.

> It is well established that the government has broad powers to conduct searches at the border even where, as here, there is no reasonable suspicion that the prospective entrant has committed a crime.  *See, e.g.*, *United States v. Flores-Montano*, 541 U.S. 149, 153, 124, S.Ct. 1582, 158 L.Ed.2d 311 (2004) ("Congress, since the beginning of our Government, has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant. . . .") (internal quotation marks omitted); *United States v. Montoya de Hernandez*, 473 U.S. 531, 538, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) ("Routine searches of the persons and effects of entrants are not subject to any requirements of reasonable suspicion, probable cause, or warrant. . . ."); *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). ("[S]earches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border...."); *United States v. Nieves,* 609 F.2d 642, 645 (2d Cir.1979) ("It long has been established that routine border searches, conducted for the purpose of controlling the movement of people and goods across our national boundaries, do not violate the Fourth Amendment's

prohibition against unreasonable searches."). Accordingly, a suspicionless search at the border is permissible under the Fourth Amendment so long as it is considered to be "routine." *See, e.g., United States v. Irving,* 452 F.3d 110, 123 (2d Cir.2006).

The precise line between what is routine and what is not routine, however, has not been clearly delineated. On the one hand, it has been held that "[r]outine searches include those searches of outer clothing, luggage, a purse, wallet, pockets, or shoes which, unlike strip searches, do not substantially infringe on a traveler's privacy rights." *Id.* (citing *United States v. Grotke,* 702 F.2d 49, 51-52 (2d Cir.1983)). By contrast, "more invasive searches, like strip searches, require reasonable suspicion." *Id.* The Supreme Court has stated that "non-routine" searches include "strip, body cavity, or involuntary x-ray searches." *Montoya de Hernandez,* 473 U.S. at 541 n. 4, 105 S.Ct. 3304. The determining factor is not how ordinary or commonplace a search is, but rather "the level of intrusion into a person's privacy." *Irving,* 452 F.3d at 123.

\*     \*     \*

Plaintiffs complain that they were required to answer intrusive questions about their activities at the conference, the content of the lectures they attended, and their reasons for attending. But these questions are not materially different than the types of questions border officers typically ask prospective entrants in an effort to determine the places they have visited and the purpose and duration of their trip. *See United States v. Silva,* 715 F.2d 43, 47 (2d Cir.1983) (noting that questions about "citizenship, the length and purpose of [an applicant's] trip to Canada, [and] what items she had acquired or bought in Canada" are all routine). Likewise, pat-down searches have repeatedly been found to be routine, even when they were followed by the lifting of an applicant's shirt or the forced removal of shoes. *See, e.g., United States v. Charleus,* 871 F.2d 265, 268 (2d Cir.1989) (While "[t]he light touching of appellant's back followed by a lifting of his shirt arguably straddles the line between the two categories of border searches," it can be considered a routine search because "the potential indignity .... fail[ed] to compare with the much greater level of intrusion associated with a body

cavity or full strip search...."). The forcing open of plaintiffs' feet that we assume to have occurred here in at least two instances, while perhaps marginally more invasive than the lifting of a shirt, is not so invasive of plaintiffs' privacy as to be distinguishable from our holdings that pat-down searches are routine.

We also conclude that the fingerprinting and photographing of plaintiffs does not take the searches out of the realm of what is considered routine because, at least in the context of a border search, being fingerprinted (even forcibly) and photographed is not particularly invasive, especially considering that the photographs and fingerprints were used solely to verify plaintiffs' identities and then were discarded from the government's databases. *See Davis v. Mississippi,* 394 U.S. 721, 727, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) ("Fingerprinting involves none of the probing into an individual's private life and thoughts that marks an interrogation or search."); *Nicholas v. Goord,* 430 F.3d 652, 658 (2d Cir.2005) (noting that the Supreme Court has suggested that fingerprinting is not entitled to Fourth Amendment protection and describing fingerprinting as a "non-intrusive means of obtaining physical evidence ..."); *Montoya de Hernandez,* 473 U.S. at 539-40, 105 S.Ct. 3304 ("[N]ot only is the expectation of privacy less at the border than in the interior, the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border.") (internal citation omitted).

Thus, each of the individual elements of the searches was routine. And while we leave open the possibility that in some circumstances the cumulative effect of several routine search methods could render an overall search non-routine, we do not find that to be the case here. While plaintiffs were undoubtedly made uncomfortable and angry by the searches, and they may understandably have felt stigmatized, their personal privacy was not invaded in the same way as it would have been had they been subject to a body cavity or strip search, or involuntary x-ray. Because the decisive factor in the analysis is invasiveness of privacy-not overall inconvenience-we find that CBP's searches of plaintiffs, considered in their entirety, were routine in the border context, albeit near the outer limits of what is permissible absent reasonable suspicion.

                              *        *        *

Finally, plaintiffs argue that the duration of their **detentions**-between four and six hours-cannot be considered routine because U.S. citizens do not expect to be held at the **border** for that **length** of time. Plaintiffs rely on *United States v. Montoya de Hernandez,* in which the Supreme Court treated as non-routine the 16-hour detention of a woman whom customs officials suspected of smuggling drugs via her alimentary canal. 473 U.S. at 535, 540, 105 S.Ct. 3304. Defendants, on the other hand, cite *United States v. Flores-Montano,* in which the Supreme Court held that a one-hour delay incident to a border search did not render that search non-routine because "[w]e think it clear that delays of one to two hours at international borders are to be expected." 541 U.S. at 155 n. 3, 124 S.Ct. 1582.

While the searches here fall between these two poles, we believe they are more akin to the one-hour delay in *Flores-Montano* than the overnight detention in *Montoya de Hernandez.* The Supreme Court noted in *Flores-Montano* that "no cases indicat[e] [that] the Fourth Amendment shields entrants from inconvenience or delay at the international border." 541 U.S. at 155 n. 3, 124 S.Ct. 1582. Moreover, the Supreme Court has "consistently rejected hard-and-fast time limits" in evaluating the reasonableness of border searches and has stressed that " 'common sense and ordinary human experience must govern over rigid criteria.' " *Montoya de Hernandez,* 473 U.S. at 543, 105 S.Ct. 3304 (quoting *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (observing that there are no rigid time limits on Terry stops)). In other words, we must consider "whether the detention of [the traveler] was reasonably related in scope to the circumstances which justified it initially." *Id.* at 542, 105 S.Ct. 3304.

While a delay of four, five, or six hours is obviously of more serious magnitude than a delay of "one to two hours," "common sense and ordinary human experience" suggest that it may take up to six hours for CBP to complete the various steps at issue here, including vehicle searches, questioning, and identity verification, all of which we have already found to be routine. The additional four hours, while

> certainly inconvenient, thus cannot be considered an
> unexpected "level of intrusion into a person's privacy," *Irving,*
> 452 F.3d at 123, that by itself would render the searches
> non-routine.

*Id.* at 97-101.

It is also pointed out that *Miranda* warnings do not have to be given to one

detained at the border for purposes of being subjected to a routine customs inquiry.

*United States v. Moody*, 649 F.2d 124, 127 (2d Cir. 1981); *United States v. Silva*, 715

F.2d 43, 46 (2d Cir. 1983).

Even if it were assumed, *arguendo*, that "reasonable suspicion" and/or

"probable cause" were required in order to allow the agents to detain and question the

defendant, the defendant's argument in support of her motion to suppress her

statements nevertheless fails.

Special Agent Randle had more than sufficient information to suspect that

the defendant was engaged in illicit or criminal activity based on his personal

observations of the defendant in the casino parking ramp and the parking lot in which

the Mazda Tribute (ANRP08) containing the four individuals was parked.  (T. 86-87, 87-

88, 88-89, 89-90, 90-91, 91-92).  Special Agent Randle also had information about the

defendant's activities while in the casino which he obtained from the casino security

department.  (T. 87).  This furtive activity of the defendant provided reasonable

suspicion to CBP officials, in response to Special Agent Randle's directive, to conduct a

thorough inspection of the defendant when she arrived at the Rainbow Bridge in her attempt to depart the United States in accordance with the collective or imputed knowledge doctrine. *United States v. Colon*, 250 F.2d 130, 135 (2d Cir. 2001); *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).

Thereafter, the information obtained by Special Agent Randle in his interview of Zhong, Liew, Lim and Liu clearly establishes probable cause for the detention and interrogation of the defendant.  (05-M-118, Docket #1, ¶s 9-11).

Lastly, it is pointed out that the defendant has not refuted the testimony of Special Agent Randle wherein he stated that when he first addressed the defendant at the secondary inspection area under the "canopy," he "read her Miranda rights from the Advisement of Rights card" in English and she "acknowledged the Rights and/or Warnings" and agreed to answer his questions.  (T. 96, 110-111, 113, 118-119).

There was no interrogation of the defendant after she had been removed from the secondary inspection area under the "canopy" to the "hold room" in the Bridge facility.  The fact that the defendant was held alone in the "hold room" for a substantial period of time while the agents interviewed Zhong, Liew, Lin and Liu and continued to search her vehicle is of no legal consequence.  During that period of time, the defendant was not interrogated by anyone and, therefore, I fail to see how she was legally prejudiced or denied her constitutional right against self-incrimination during that

time period.  Since this was a detention at an international border inspection post, the

Fifth Amendment "balancing of interests leans heavily to the government."  *United*

*States v. Montoya de Hernandez, supra* at 544.  The second round of interrogation of

the defendant did not begin until Special Agent Glor arrived at the scene and the

defendant was brought into the "break room" of the Bridge facility.  Special Agent Glor

heard and observed Special Agent Randle "[give] Miranda warnings" to the defendant

by reading"them off the card that [he] had and the defendant "acknowledged the

warnings as he provided them to her" and the defendant indicated her willingness to

waive her rights when asked by Special Agent Randle.  (T. 63, 65, 70, 73, 75-76).  In

response to a question by this Court, Special Agent Glor testified that there was no

questioning of the defendant before Special Agent Randle read the warnings and

advice of rights to the defendant.  (T. 81-82).


It is the finding of this Court that the defendant was given warnings and

advice of rights in accordance with *Miranda v. Arizona*, 384 U.S. 436 (1966).  However,

it is the claim of the defendant that she did not properly waive her rights by reason of

the fact that she did not understand what was being read to her by Special Agent

Randle because of her deficiency in the English language (Docket #56, pp. 17-18) and

the defendant cites the testimony of her aunt, Fanny Lai-Fan Leung, to support this

claim.  (T. 131-140, 156).

It is acknowledged that "the government bears the burden of demonstrating by a preponderance of the evidence that a defendant waived [her] constitutional rights."  *United States v. Lynch*, 92 F.3d 62, 65 (2d Cir. 1996); *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991).

It is the opinion of this Court that the government has met its burden in establishing by a preponderance of the evidence that the defendant understood the warnings and advice of rights that were read to her by Special Agent Randle while in the secondary inspection area under the "canopy" and thereafter in the "break room."

Nothing has been presented to cause me to question the credibility of Special Agents Randle, Glor and Uzarowski and supervising officers Corsaro and Scoma and their testimony that conversations were conducted in English with the defendant and the defendant appeared to understand what was being said; so much so that Randle, Glor and Scoma did not see any need to call an interperter.  (T. 11, 12, 15-16, 21, 25, 28, 37, 38, 41-42, 51-52, 64, 77-78, 82, 83, 93, 95, 98, 99, 125, 128).

Furthermore, I find it reasonable to conclude that the defendant did have a basic, working knowledge of the English language based on the testimony of her aunt.  The defendant attended school in her early years in Hong King, China where English was taught.  (T. 145).  The defendant began living in Canada at the age of 12 or 13 and attended schools in Toronto, Ontario, Canada where English was taught. (T.

145-146).  At the time of the incident of September 25, 2005, the defendant had been a resident of Canada for approximately twenty (20) years.  (T. 144).

As a result, I find that the defendant was able to understand the warnings and advice of rights given to her by Special Agent Randle on September 25, 2005 and therefore conclude that the government has met its "burden of demonstrating by a preponderance of the evidence that the defendant waived her constitutional rights." Therefore, it is RECOMMENDED that the defendant's motion to suppress her statements as evidence at trial be DENIED.

**B.     Defendant's Motion To Suppress Physical Evidence:**

**1.     The Search of Defendant's Vehicle On September 25, 2005:**

The defendant argues that the defendant had not entered Canada when she arrived at the international border inspection post at the Rainbow Bridge and therefore "there [was] no reasonable basis to believe that [she] would be bringing any contraband or other questionable items from the United States into Canada."  As a result, "there was no reason for the agents to conduct an exit search."  She further asserts that since the "stop of [her] vehicle and its search . . . took place based upon less than reasonable belief that a crime was being committed, [her] vehicle should not have been stopped" and "the agents should not have searched her car."  (Docket #17, p. 25).

The search of the defendant's car on September 25, 2005 resulted in the finding and seizure of "a plastic bag containing rubber bands, a box containing white plastic garbage bags, a roll of clear plastic box tape, a calculator, two small plastic bags with sequentially ordered numerical markings printed upon them and other items." (Docket #17, p. 24).

For the reasons set forth in addressing defendant's motion to suppress her statements, this argument of defendant is totally without merit and therefore, it is RECOMMENDED that this particular aspect of the defendant's motion to suppress the physical evidence seized from her vehicle on September 25, 2005 be DENIED.

**2.      The Search Of Defendant's Vehicle On September 13, 2006:**

After the defendant had been arrested on September 25, 2005, her vehicle was seized by the Bureau of Immigration and Customs Enforcement ("BICE") and thereafter, forfeiture proceedings were instituted in the United States District Court, Western District of New York (*United States v. 2004 Toyota Corolla*, 06-CV-40) on January 19, 2006.

"Continually, from September 25, 2005 [the defendant's] vehicle remained in the custody of the Port Director of the United States Bureau of Customs and Border Protection at Buffalo, New York."  (Docket #27, p. 3).  On or about September 13, 2006,

a search of the defendant's vehicle was conducted by agents of the CBP and $25,000 in U.S. currency and $500 Canadian currency was discovered in the "headliner of the defendant's seized 2004 Toyota Corolla vehicle."  (Docket #26, p. 3; Docket #27, Exhibit 2 attached thereto).

The defendant argues that this search of her vehicle and the seizure of the aforesaid currencies were illegal since "there has been no justification for the entry into the vehicle and the search of the headliner of the vehicle without the benefit of a search warrant."  (Docket #26, p. 5).  The defendant asserts that "the government cannot justify the search by claiming that this is merely an automobile search because of the lack of mobility of the defendant's vehicle as it has been stored at a place unknown to [the defendant] by the United States government" and "that the search was not conducted pursuant to a valid inventory."  (Docket #26, p. 5).  She further argues that "because the search of [her] vehicle took place at a time remote from the initial seizure there is not justification for later searching the vehicle without a search warrant;" nor can the search of her vehicle "be justified as an extended border search because the search of the vehicle did not take place in an extended geographic area in the immediate vicinity of any entry point."  (Docket #26, p. 5).

The Supreme Court of the United States has ruled that the Fourth Amendment does not require that agents obtain a search warrant before seizing an automobile when they have probable cause to believe that it is forfeitable contraband.

*Florida v. White*, 526 U.S. 559, 561 (1999).  The defendant's vehicle was seized and made the subject of a forfeiture proceeding "pursuant to the provisions of Title 31, United States Code, Section 5324(c), and Title 18, United States Code, Section 981(a)(1)(A) for its involvement in the attempted transportation of the funds out of the United States in violation of Title 18, United States Code, Section 1956(a)(2)(A)." (*United States v. 2004 Toyota Corolla*, 06-CV-40, Docket #1, ¶ 1).  Probable cause for this seizure had been established based on the observations of Special Agent Randle at the casino parking lots involving the defendant and the four individuals on September 25, 2005 as well as the admissions made by those individuals to Special Agent Randle when interviewed at the Bridge facility and the seizure of the bundles of currency from those individuals at the Bridge facility.  More specifically, Liew had advised Special Agent Randle that while in the defendant's vehicle in the casino parking ramp, the defendant gave him "bundles of U.S. currency" which he then distributed to Zhong, Lin and Liu for the purpose of having this currency transported into Canada by structuring the currency in amounts possessed by each individual so as to avoid the $10,000 reporting requirements when leaving the United States.  Since the defendant had used her vehicle to enter the United States for the alleged purpose of meeting with Liew, Zhong, Lin and Liu and the distribution of the bundles of currency for transportation from the United States to Canada, it was legally subject to seizure and subsequent forfeiture proceedings.

The defendant's claim that a search warrant was required to search her

vehicle on September 13, 2006 because there was time from the date of seizure of September 25, 2005 to secure a warrant without risking the loss of evidence "is an inaccurate statement of law" as found by the United States Court of Appeals for the Second Circuit wherein the Court stated:

> [T]he law is well settled that when a car is seized by the federal agents pursuant to [a forfeiture statute], on the grounds that it was used to transport contraband, the agents may search the car without a warrant.

*United States v. Zaicek*, 519 F.2d 412, 414 (2d Cir. 1975).

The fact that the search of defendant's vehicle occurred almost one year after the seizure is of no legal consequence.  The vehicle was seized as the initial step in the commencement of forfeiture proceedings pursuant to 31 U.S.C. § 5317(c)(2) and it was being held for that purpose.  As of September 13, 2006, the forfeiture proceedings instituted by the government against defendant's vehicle had not been completed since counsel for the defendant, as a claimant to the vehicle, requested that the forfeiture proceedings be stayed pending resolution of the criminal case. (*United States v. 2004 Toyota Corolla*, 06-CV-40, minute entry June 28, 2006).  The holding of the United States Supreme Court in *Cooper v. State of California*, 386 U.S. 58 (1967) expressly addresses this issue.

> The forfeiture of petitioner's car did not take place until over four months after it was lawfully seized.  It would be unreasonable to hold that the police, having to retain the car in their custody for such a length of time, had no right, even for their own protection, to search it.  It is no answer to say

> that the police could have obtained a search warrant, for
> "[t]he relevant test is not whether it is reasonable to procure
> a search warrant, but whether the search was reasonable."
> *United States v. Rabinowitz*, 339 U.S. 56, 66, 70 S.Ct. 430,
> 435, 94 L.Ed. 653.  Under the circumstances of this case,
> we cannot hold unreasonable under the Fourth Amendment
> the examination or search of a car validly held by officers for
> use as evidence in a forfeiture proceeding.

*Id.* at 61-62.

Therefore, it is RECOMMENDED that defendant's motion to suppress the

evidence seized from her vehicle on September 13, 2006 be DENIED; and it is hereby

**ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the

Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be

filed with the Clerk of this Court within ten (10) days after receipt of a copy of this

Report, Recommendation and Order in accordance with the above statute,

Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments,

case law and/or evidentiary material which could have been, but were not presented to

the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**

*S/ H. Kenneth Schroeder, Jr.*
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**

**DATED:**      **Buffalo, New York**
              **December 2, 2008**